NO.
12-04-00309-CV

 

IN THE COURT OF APPEALS

 

TWELFTH COURT OF APPEALS DISTRICT

 

TYLER, TEXAS

 

 

MELODY ANNE OBESO
VERHAGE,      §          APPEAL FROM THE 

APPELLANT

 

V.        §          COUNTY
COURT AT LAW OF

 

JOHN VERHAGE,

APPELLEE   §          CHEROKEE
COUNTY, TEXAS

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 

 



MEMORANDUM OPINION








            Melody Anne
Obeso Verhage appeals the decree of annulment ordered by the trial court.  On appeal, Melody presents five issues. We
reverse and remand in part and affirm in part.

                                                                                                                                    

Background

            Melody
and John Verhage were married on March 28, 1998.  Melody was originally from the Philippines,
and the couple became acquainted through a pen pal magazine. They began
corresponding and, in October 1997, John went to the Philippines to interview
Melody and several other women.  John and
Melody met and, eventually, John proposed marriage and applied for a fiancé
visa to the United States.  At the time
of their marriage, Melody was eighteen years old and John was sixty-eight. 








            On
July 31, 2002, Melody left John.  On
September 18, 2002, John filed for divorce, accusing Melody of cruel treatment
and adultery.  John requested a
disproportionate share of the parties’ estate for several reasons, including
fault in the breakup of the marriage.  In
his amended petition for divorce, John alleged that Melody committed actual
fraud and conversion of his separate property (specifically cash in the amount
of $60,000).  He also alleged that Melody
had breached her duty not to transmit a sexual disease to him.  In her original and amended answers, Melody
asked that she be awarded a disproportionate share of the parties’ estate,
alleging that John breached his duty not to transmit a sexual disease to her
and committed fraud by converting her share of a 2000 Ford Mustang automobile. 

            At
pretrial hearings and a nonjury trial, Melody and John testified regarding
their courtship, as well as their marriage and its eventual
disintegration.  John testified that he
wanted to find a good wife who would stand beside him for the rest of his
life.  He accused Melody of adultery and
cruel treatment.  Melody stated that she
agreed to marry John because he was nice to her, God fearing, impressive, and
made promises to her.  Melody admitted
that she did not love John when she came to the United States, but cared for
him.  Both admitted that John spent money
on Melody and her family in the Philippines. 
John testified that Melody stole money from him and that approximately
$60,000 was missing from a safe in his house. 
Both John and Melody had genital herpes, and each accused the other of
transmitting it. Additional accusations were made by both parties during the
trial regarding credit cards, bank accounts, and cruel treatment during their
marriage.  At the conclusion of the
trial, the trial court found, in part, that the 2000 Ford Mustang was a gift to
Melody and her separate property, that John failed to meet his burden to trace
the $60,000 cash he alleged Melody converted, that the medical evidence was
insufficient to prove transmittal of the sexual disease, that Melody admitted
love was not the basis of the relationship, and that the inception of the
marriage was a fraudulent relationship intended for the purpose of finding and
procuring resident status and obtaining funds to benefit Melody and her family.

            On
August 3, 2004, the trial court ordered an annulment.  In the decree of annulment, the trial court
also found that Melody abandoned the 2000 Ford Mustang, that John sold the
Mustang due to her abandonment and retained the funds from the sale, and that
any value of the Mustang was offset by Melody’s fraud in diverting John’s
separate property funds for her and her family’s benefit.  After proper requests, the trial court filed
findings of fact and conclusions of law and additional findings of fact. This
appeal followed.

 

Standard of
Review

            A
trial court’s findings of fact are reviewed for legal and factual sufficiency
of the evidence under the same legal standards applied to review jury verdicts
for legal and factual sufficiency of the evidence.  Ortiz v. Jones, 917 S.W.2d 770,
772 (Tex. 1996); M.D. Anderson v. City of Seven Points, 806
S.W.2d 791, 794 (Tex. 1991).  In
considering whether the evidence is legally sufficient, we consider only the
evidence and inferences tending to support the trial court’s findings and
disregard all evidence to the contrary.  M.D.
Anderson, 806 S.W.2d at 794-95. 
We must consider evidence in the light most favorable to the trial court’s
findings and indulge every reasonable inference that would support them.  See City of Keller v. Wilson,
168 S.W.3d 802, 822 (Tex. 2005).  In our
review, we must credit favorable evidence if a reasonable trier of fact could
and disregard contrary evidence unless a reasonable trier of fact could not.  See id. at 827.  However, we must not substitute our judgment
for that of the trial court as long as the evidence falls within the zone of
reasonable disagreement.  See id.
at 822.

            In
reviewing factual sufficiency, we must weigh all of the evidence in the
record.  Ortiz, 917 S.W.2d
at 772.  Findings may be overturned only
if they are so against the great weight and preponderance of the evidence as to
be clearly wrong and unjust.  Id.  However, when the appellate record contains a
reporter’s record, findings of fact are not conclusive on appeal if the
contrary is established as a matter of law or if there is no evidence to
support the finding.  Material P’ships,
Inc. v. Ventura, 102 S.W.3d 252, 257 (Tex. App.–Houston [14th Dist.]
2003, pet. denied). 

            We
review the trial court’s conclusions of law de novo.  Id.  The standard of review for conclusions of law
is whether they are correct.  Id.  We will uphold conclusions of law on appeal
if the judgment can be sustained on any legal theory the evidence supports.  Id.  Thus, incorrect conclusions of law do not
require reversal if the controlling findings of fact support the judgment under
a correct legal theory.  Id.


                                                                                                

Annulment

            In
her first issue, Melody argues that the trial court erred in ordering an
annulment because neither party requested an annulment and neither the
pleadings or the evidence support an annulment. The judgment of a trial court
shall conform to the pleadings of the parties. 
Tex. R. Civ. P. 301; Cunningham
v. Parkdale Bank, 660 S.W.2d 810, 812 (Tex. 1983).  Further, a judgment must be supported by the
pleadings and, if not, it is erroneous.  Cunningham,
660 S.W.2d at 813.  A party may not
obtain a judgment based upon a theory not pleaded.  Affiliated Capital Corp. v. Musemeche,
804 S.W.2d 216, 219 (Tex. App.–Houston [14th Dist.] 1991, writ denied).  Thus, a party may not be granted relief in
the absence of pleadings to support that relief.  Cunningham, 660 S.W.2d at 813; Holmstrom
v. Lee, 26 S.W.3d 526, 532 (Tex. App.–Austin 2000, no pet.).  Both Melody and John pleaded for a divorce,
not an annulment. However, the trial court ordered that their marriage be
annulled, contrary to the pleadings of both parties.  Because a judgment must be supported by the
pleadings and neither party pleaded for an annulment, the trial court’s decree
of annulment is erroneous.  See Cunningham,
660 S.W.2d at 812-13; Holmstrom, 26 S.W.3d at 532.          However,
in its initial findings of fact and conclusions of law, the trial court
determined that Melody’s fraud to induce John to marry was tried by implied
consent pursuant to Rule 67 of the Texas Rules of Civil Procedure.  To support this ground for annulment, the
trial court found that John did not learn of Melody’s fraud until after their
separation and, thereafter, the parties had not cohabited.[1]  In its additional findings of fact, the trial
court found that Melody induced John to marry her by material false
representations “that she loved him, [that] she intended to engage in and
remain in a traditional perpetual marriage, and [that] she intended to care for
him in his advancing years and declining health.”  The trial court found that Melody intended
for John to rely upon such false representations and that he relied upon them
in his decision to marry her.  Further,
the trial court found that Melody engaged in a plan of “intended deceit” to
marry John for the “sole purpose” of obtaining legal status in the United
States and of obtaining as much of John’s liquid assets as possible.  The record shows that Melody and John both
pleaded for a disproportionate share of the parties’ estate based, in part,
upon fault in the breakup of the marriage. 
John argues that the issue supporting an annulment, fraudulent
inducement to marry, was tried by consent. 
Melody disagrees. 

            Rule
67 of the Texas Rules of Civil Procedure allows issues not raised by the
pleadings that are tried by express or implied consent to be treated in all
respects as if they had been raised in the pleadings.  Tex.
R. Civ. P. 67.  However, the
doctrine of trial by consent is limited to those exceptional cases where the
parties clearly tried an unpleaded issue by consent.  In re Walters, 39 S.W.3d 280,
289 (Tex. App.–Texarkana 2001, no pet.). 
This doctrine should be applied cautiously, not in doubtful situations,
and only where it appears from the record that the issue was actually tried,
although not pleaded.  Id.  When evidence relevant to both a pleaded and
an unpleaded issue has been admitted without objection, the doctrine of trial
by consent should not be applied unless clearly warranted.  Id.  To determine whether an issue was tried by
consent, we must examine the record for evidence of trial of the matter, rather
than evidence of the issue.  Id.

            A
trial court has wide discretion in dividing the estate of the parties; thus,
many factors may be considered in making a just and right division of the
property.  See Murff v. Murff,
615 S.W.2d 696, 698-99 (Tex. 1981).  Both
John and Melody sought a disproportionate share of the marital estate.  At trial, Melody and John testified regarding
the origins of their relationship, their marriage, and its subsequent
deterioration. Testimony regarding the origins of the marriage, including
Melody’s love or lack thereof for John, her reasons for marrying John, and the
subsequent breakup of the marriage is relevant to the division of property, an
issue pleaded by both parties.  See
In re Walters, 39 S.W.2d at 289. 
Moreover, John specifically alleged actual fraud as a reason he should
receive a disproportionate share of the estate. 
Therefore, the issue of fraud was supported by the pleadings insofar as
it related to the issue of property division. 
However, neither party sought an annulment.  Because evidence relevant to a pleaded issue,
division of property, was admitted without objection, we cannot apply the
doctrine of trial by consent to the issue of the unpleaded issue, annulment,
unless clearly warranted.  See id.  Both John and Melody requested a divorce in
their pleadings and at trial during closing arguments.  Neither mentioned an annulment.  As such, we can surmise that neither party
contemplated that the trial court would order an annulment instead of a
divorce. Therefore, because there is no evidence in the record that the issue
of annulment was actually tried before the court, we cannot apply the doctrine
of trial by consent to the issue.  See
id. Accordingly, Melody’s first issue is sustained. 

 

Divestiture
of the Mustang

            In
her second issue, Melody contends that the trial court erred as a matter of law
by divesting her of her separate property, the 2000 Ford Mustang.  John disagrees, arguing that the trial court
imposed a charge against Melody’s separate estate that could be validly paid
through forced sale or foreclosure. 

Applicable Law

            All
property, both real and personal, owned or claimed by a spouse before marriage,
and that acquired afterward by gift, devise, or descent, shall be the separate
property of that spouse.  Tex. Const. art. XVI, § 15.  If one spouse makes a gift of property to the
other, that gift is presumed to include all the income or property which might
arise from that gift of property.  Id.  The constitution contains the exclusive
definition of separate property, and the legislature cannot alter or enlarge
upon it.  Cameron v. Cameron,
641 S.W.2d 210, 213 (Tex. 1982).  Thus,
the Texas Family Code defines a spouse’s separate property as that property acquired
by the spouse during marriage by gift, devise, or descent.  Tex.
Fam. Code Ann. § 3.001(2) (Vernon 1998). 
Any judicial divestiture of separate property would essentially
disregard the constitutionally mandated distinction between the separate and community
property of spouses.  Cameron,
641 S.W.2d at 213.  Moreover, allowing a
trial court to divest separate property from one spouse and award it to the
other spouse as part of the latter’s separate estate would impermissibly
enlarge the exclusive constitutional definition of separate property.  Id. 

            In
a decree of divorce or annulment, the court shall order a division of the
estate of the parties in a manner that the court deems just and right, having
due regard for the rights of each party and any children of the marriage.  Tex.
Fam. Code Ann. § 7.001 (Vernon 1998). 
The phrase “estate of the parties” refers only to community
property.  Cameron, 641
S.W.2d at 214.  Section 7.001 of the
Texas Family Code authorizes a “division of the estate of the parties,” but
provides no authority for a court to “divest” a divorcing spouse’s separate
property.  See id. at
215.  Subject to certain exceptions not
applicable here, the power of a trial court is limited to a disposition of the
community property  and does not include
the power to dispose of separate property. 
Id. at 216. 

Analysis

            In
the decree of annulment, the trial court found that the 2000 Ford Mustang was a
gift from John to Melody and that the value of the Mustang was “more than set
off” by Melody’s fraud in diverting John’s separate property funds for her and
her family’s benefit.  In its findings of
fact and conclusions of law, the trial court found that the Mustang was her
separate property, and that the value of the Mustang was less than the amount
of John’s separate property funds taken by Melody by and through her fraud in
the inducement to marry.  John admitted
selling the Mustang in August 2002 and, therefore, the trial court found that
the Mustang was unavailable for division and/or distribution in kind.

            According
to the trial court, the Texas Constitution, and the Texas Family Code, the 2000
Ford Mustang was Melody’s separate property by gift.  See Tex.
Const. art. XVI, § 15; Tex. Fam.
Code Ann. § 7.001.  Neither party
disputed the trial court’s finding. 
Because the Mustang was Melody’s separate property, the trial court had
no authority to divest her of that property. 
Cameron,  641 S.W.2d
at 215. Therefore, we conclude that trial court erred as a matter of law by
divesting Melody of the Mustang. Accordingly, Melody’s second issue is
sustained.

 

Abandonment
of Mustang

            In
her third issue, Melody contends that there was insufficient evidence to
support the trial court’s finding that she intended to abandon the 2000 Ford
Mustang.  John disagrees.  In its decree of annulment, the trial court
found that Melody abandoned the Mustang. 
Additionally, the trial court found that Melody intended to abandon the
Mustang.  “Abandon” means to give up
absolutely, to forsake entirely, to renounce utterly, to relinquish all
connection with or concern in, and to desert. R.R. Comm’n of Texas v.
Waste Mgmt. of Texas, Inc., 880 S.W.2d 835, 843 (Tex. App.–Austin 1994,
no writ).  When applied to personal
property, the term also includes an intent by the owner to leave the property
free to be appropriated by any other person. 
Id. 

            Melody
testified that, when she left John on July 31, 2002, she was unable to take
the  Mustang with her.  Melody stated that she was not a very
experienced driver and what experience she had was in town.  According to Melody, she did not have enough
confidence to drive to California.  Thus,
Melody left the Mustang in the Sam’s Club parking lot in Tyler, Texas.  She telephoned John’s daughter, Nanette
Elaine Verhage, told Nanette that she was leaving John, and asked Nanette to
pick up the Mustang.  Melody denied
abandoning the Mustang.  Nanette
testified that Melody called, stating the Mustang was in the Sam’s Club parking
lot and that it needed to be picked up. 
John’s son, Daniel Verhage, testified that he, his wife, and his wife’s
friend picked up the Mustang from the Sam’s Club parking lot.  According to Daniel, the keys were in the
Mustang, but he did not believe that the Mustang was locked.  John testified that Melody told Nanette to
have him take his keys to open the Mustang.

            The
evidence tending to support the trial court’s findings includes Melody’s
leaving the Mustang in the parking lot of Sam’s Club in Tyler, instead of
driving it to California.  The automobile
was left with the keys inside and may have been unlocked.  However, we cannot disregard contrary
evidence unless a reasonable trier of fact could not. See City of Keller,
168 S.W.3d at 827.  Contrary to the
findings, Melody requested that Nanette pick up the Mustang or arrange for its
retrieval.  Moreover, the great weight
and preponderance of the evidence does not support the findings that Melody
abandoned and intended to abandon the Mustang because she never renounced or
relinquished her ownership of the vehicle and she arranged for its retrieval by
Nanette or someone of her choosing.  See
Ortiz, 917 S.W.2d at 772. 
Because the evidence does not tend to support these findings and they
are against the great weight and preponderance of the evidence, the evidence is
both legally and factually insufficient to support the trial court’s findings
that Melody abandoned and intended to abandon the 2000 Ford Mustang.  Accordingly, Melody’s third issue is
sustained.

Acquisition
of Property

            In
her fourth issue, Melody argues that there was insufficient evidence to support
the trial court’s finding that she obtained a large amount of John’s separate
property liquid assets, primarily cash from his safe, without his knowledge or
consent.  John disagrees.

            According
to John, he had approximately $60,000 cash in a new keyed safe after he and
Melody were married.  After buying the
safe, John did not see the safe again until three years later. After Melody
left, he found a spare key, opened the safe, and found that the money was
gone.  However, the safe contained a
piece of paper with a notation of “54,545.95" written in Melody’s
handwriting.  John admitted that he had
not looked in the safe in over two years nor had his children. John offered no
other documentation to support his testimony that he had $60,000 in the safe at
the time of his marriage or any other documentary evidence showing the amounts
of money entering or leaving the safe. 
Moreover, none of John’s children who testified recalled seeing the safe
or the amount of funds in the safe that John alleged. 

            As
far as other separate property liquid assets allegedly taken by Melody, John
admitted that he spent large sums of money on Melody’s family in the
Philippines, sending them approximately $15,000 to $20,000 per year, buying
them a multicab, and paying for Melody’s sister’s medical bills and
funeral.  Further, John admitted making
transfers of money to the Philippines and knew that Melody sent money he gave
her to her ill sister.  John offered no
documentary evidence to prove that Melody diverted funds from his accounts or
cash holdings to send to her family without his permission. 

            Even
if we consider only the evidence tending to support the trial court’s finding,
we cannot disregard evidence contrary to the trial court’s finding.  See City of Keller, 168 S.W.3d
at 827. Moreover, without documentary evidence, the trial court’s findings are
so against the great weight and preponderance of the evidence as to be clearly
wrong and unjust.  See Ortiz,
917 S.W.2d at 772.  Because the evidence
does not tend to support this finding and it is against the great weight and
preponderance of the evidence, the evidence is legally and factually
insufficient to support the trial court’s finding that Melody obtained a large
amount of John’s separate property liquid assets (primarily cash from his safe)
without his knowledge or consent. 
Accordingly, Melody’s fourth issue is sustained.

Sexually
transmitted Disease

            In
her fifth issue, Melody contends that the trial court’s finding that there was
insufficient evidence regarding the cause of the parties’ sexually transmitted
disease was against the great weight and preponderance of the evidence.  John disagrees. 

            The
evidence shows that Melody began showing signs of genital herpes, a sexually
transmitted disease, at the beginning of August 2001.  She denied having sexual relations with
anyone other than John during their marriage. 
Melody testified that, prior to her outbreak, John had reddish spots on
his penis.  However, John was not tested
for genital herpes at that time.  Melody
stated that she was diagnosed with genital herpes in February 2002.  John testified that Melody had extramarital
affairs and that they rarely had sex. 
Although John testified at one point that none of his former wives had a
sexually transmitted disease, he later admitted that his third wife informed
him that she had a sexually transmitted disease prior to meeting him.  John alleged in his pleading that Melody
transmitted a sexual disease to him, but, at trial, denied having a sexually
transmitted disease, ever having an outbreak, or ever being told that he had a
sexually transmitted disease.  However,
John admitted that, in October 2002, he was treated for internal pain in his
urinary tract and an ulcerative lesion on his genitals.  John admitted that medical records show he
tested positive for herpes simplex virus one and two in November 2003.  According to John, Melody did not contract
genital herpes from him. 

            The
record shows and the trial court noted that no medical expert testified during
trial regarding the incubation period, rates of transmission, or how
transmission occurs in genital herpes. The cause of Melody’s and John’s genital
herpes must be shown by competent evidence. 
See Praytor v. Ford Motor Co., 97 S.W.3d 237, 241 (Tex.
App.–Houston [14th Dist.] 2002, no pet.). 
Lay testimony will suffice when general experience and common sense will
enable a lay person fairly to determine the causal nexus.  Id.  However, whether Melody or John caused the
other to contract genital herpes is not a question that can be answered by
general experience and common sense.  See
Leitch v. Hornsby, 935 S.W.2d 114, 119 (Tex. 1996); Praytor,
97 S.W.3d at 241.  As such, expert
testimony is required.  Praytor,
97 S.W.3d at 241.  When expert testimony
is required, lay evidence supporting causation is legally insufficient.  See City of Keller, 168 S.W.3d
at 812.

            Because
both Melody and John failed to support their claims regarding the cause of
their sexually transmitted disease with expert medical testimony, the trial
court’s finding that there was insufficient evidence regarding the cause of the
parties’ sexually transmitted disease was not so against the great weight and
preponderance of the evidence as to be clearly wrong and unjust.  See Ortiz, 917 S.W.2d at
772.  Accordingly, Melody’s fifth issue
is overruled.

 

Conclusion

            Having
sustained Melody’s first, second, third, and fourth issues, we reverse
the decree of annulment and remand to the trial court for the
entry of a divorce decree consistent with this opinion.  In all other respects, the trial court’s
judgment is affirmed.

 

                                                                                                     JAMES T. WORTHEN    

                                                                                                                 Chief Justice

Opinion
delivered June 30, 2006.

Panel consisted of Worthen, C.J.
and Griffith, J.

 

 

 

 

 

(PUBLISH)











[1] A trial court may grant an annulment of a
marriage to a party to the marriage if (1) the other party used fraud, duress,
or force to induce the petitioner to enter into the marriage; and (2) the
petitioner has not voluntarily cohabited with the other party since learning of
the fraud or since being released from the duress or force.  Tex.
Fam. Code Ann. § 6.107 (Vernon 1998).